LOTTINGER, Judge.
This is a damage suit brought against Robert E. Walsh and his liability insurer, the American Fire and Casualty Company, arising out of an automobile accident which occurred on April 25, 1947, near the City of Lake Charles in the Parish of Calcasieu. It is alleged in the petition that shortly before the accident the plaintiff, Christian, was riding as an invited guest in Walsh’s 1942 model Willys sedan en route to Baton Rouge where the two of them were to engage in some carpet laying work. It is further set forth that upon reaching a point approximately three miles east of Lake Charles, on U. S. Highway. No. 90, the petitioner, observing that Walsh was .proceeding at approximately forty miles per hour, inquired of him as to the condition of his brakes whereupon Walsh, “without slackening his speed, or taking any precautions whatsoever, jammed his right foot against the brake pedal”, causing him to •lose control of the automobile which careened in a northeasterly direction across the highway onto the opposite shoulder where it collided with a parked truck which was some fifteen feet north of the paved portion of the highway. The plaintiff pleaded the doctrine of res ipsa loquitur and, in addition, set forth the alleged acts of neg *734 ligence on the part of the defendant Walsh to be as follows:
“(a) In applying the said brakes in a negligent, careless and improper manner;
“(b) In applying the said brakes without slackening the speed of the said Willys, and without taking any other precautions;
“(c) In applying the said brakes in the manner described hereinbefore when there was no necessity for so applying them, or warning to your petitioner that they would be so suddenly applied;
“(d) In driving and operating the said automobile at an imprudent, unreasonable, and improper rate of speed, and particularly under the circumstances ;
“(e) In failing to keep a proper lookout, and in failing to keep his car under control;
“(f) In driving his said automobile from its proper lane of-traffic across to the wrong, or north, lane of traffic, and onto the shoulder on the northern side of the paved portion of said highway, and there colliding with the parked truck;
“(g) In driving the said car with defective brakes; • and,
“(h) In applying the brakes in the manner aforesaid, when he knew, or should have known, that they were in a defective condition.”
The petition ■ then sets out the injuries allegedly received by the plaintiff and concludes with a prayer for damages, in the amount of $21,938.50.
The defendants in their answers admitted generally the allegations of the petition but denied, the charges of negligence and averred that the accident was caused by a latent defect in the Willys car, i. e., that a shackle bolt on the left front spring had come loose, thus jamming the steering mechanism. They admitted that plaintiff had no control or supervision over the car, and they entered no plea of contributory negligence. When the case came on for trial counsel for defendants sought to file an amended answer, which was objected to by counsel for plaintiff and disallowed by the trial judge. We are informed by counsel for defendants that which he had originally been informed by an expert mechanic, whose testimony appears in the record by deposition, that the accident was caused by the shackle bolt becoming loose, that only a day or so before the trial he discovered that this could not have caused the accident, but that it was. due in all probability to a small amount of brake fluid leaking on the left wheel drum. While the amended answer was disallowed, counsel for defendants admit that all desired testimony was admitted and apparently any question as to the right to file the amended answer is now a moot one.
The case was tried on December 6, 1948, submitted on briefs, and on February 19, 1953, judgment was rendered casting the defendants in solido for the sum of $10,-618.50. The judgment which was later signed, however, under stipulation of counsel, recognized the policy limit of the defendant American Fire and Casualty Company in the amount of $5,000. The matter is now before us on a suspensive appeal taken by the latter and a devolutive appeal taken by Walsh.
■ The charges of negligence quoted above may be m.ore briefly set forth as follows:
(1) In applying the brakes in a negligent fashion and without warning to plaintiff of his intention to do SO' when there was no necessity for applying the brakes.
(2) In driving the car with defective brakes when he knew, or should have known, that they were in a defective condition.
(3) In failing to keep the car.under proper control and in colliding with the parked truck.
*735 Taking these points up in order, the record shows that Walsh .picked up Christian at about 1:30 p. m. at the latter’s rug cleaning plant. They proceeded through Lake Charles to the warehouse of the Southern Amusement Company where they attempted to get some nails or tacks and then proceeded to the outskirts of the City. During this time Christian testified that he noted that Walsh had to “pump” his brakes in order to stop the automobile. The parties proceeded on to a service station, where they obtained gas and oil and then left the city and proceeded eastward on U. S. Highway No. 90.
According to Christian, remembering that Walsh had had to pump his brakes and noticing that they had reached a speed of about 38 miles per hour and was still accelerating, he asked Walsh “How are your brakes?” What transpired then is related by Christian as follows:
“A. He said, ‘I have good ’brakes but I have to pump them once.’ He said, ‘However, they will stop suddenly if I push them one time.’ He said, ‘They will stop rapidly if I depress them once but I can slide my wheels if I kick them twice.’ He said, ‘I pump them.’
“Q. Then what occurred? A. With that, he proceeded to take his foot from the accelerator without any warning to me whatever and stomped . the brake down suddenly and in just a • matter of a split second, taking his foot off the accelerator right on to the brake, and as he did, it threw the car over to the left. I was trying to gain my balance because the car had started stopping so rapidly that I was thrown forward automatically, and when I did, I noticed his foot still on the brake pedal. Whether he was depressing it all the way or not, I don’t know.
“Q. At the time you observed the brake pedal was depressed, and you fell forward, at that time had the car pulled over to the left? A. The car careened immediately when he hit the brakes. It careened incidentally at about a 45 degree angle, right across the north traffic lane and off the shoulder. We hit a big parked truck on the north side.”
Later, on cross-examination, Christian testified as follows:
“I asked Mr. Walsh, ‘How are your brakes’? He said, ‘have good brakes.’ I said, T noticed that you pumped them downtown is why I asked’. He said, ‘they will stop rapidly if I depress them one time.’ By that time he proceeded to kick them down one time and we veered off the highway and after that I was on my way to the hospital.’ ”
On further cross-examination the plaintiff gave the following testimony:
“Q. Well, as far as' you know, he didn’t dó any thing anything negligent? A. Welí, he did wrong by taking his foot off the accelerator and slamming it down on the brakes to start with.
“Q. When you asked him if his brakes were working all right; wouldn't you think it would be a• natural thing for him to do to demonstrate to you that they were working all right? A. Not .necessarily.
“Q. Not necessarily, but wouldn’t that be your normal reaction, to expect that he would say, ‘Yes, they are all right. Let me show you,’ and then proceed to show you, in a reasonable way ? A. Yes, in a reasonable way, after looking in the rear view mirror and observing the traffic ahead to see that nothing was ahead or behind and then depressing your brakes gradually but not slam them down to the floor.”
Finally, on re-direct examination the plaintiff gave the following testimony:
“Q. One of the other answers you gave when counsel asked you what he did wrong was that the brakes were depressed rapidly? A. Yes, Sir.
“Q. Is that correct? A. Yes, Sir.
*736 “Q. Please describe to the court what, in your opinion, was wrong about the rapid depressing, or as you said on direct examination, the ‘stomping’ of the brakes? A. Well, if I can explain just exactly the reaction as I see it—
“Q. That is what I want you to do. A. We were riding along and after I had asked him the' condition of the brakes, 'he had1 his foot on the gas and he said, ‘Oh, I have good brakes’'.
“Q. Was he accelerating at that moment? A. Yes, at that time. I said, ‘Plow are your brakes’ ? He said, ‘I have pretty good brakes. They will stop if you kick them one time but to make 'a rapid stop, you' have to' pump them onceY: With that, "he jiist took his foot off and jammed it down on .the brakes in that manner, and I think he hit it a lot harder than he anticipated.”
The defendant Walsh readily admits "that after being questioned as to the condition of his brakes, he proceeded to demonstrate them, but he denies having “jammed” them. The following is illustrative of his testimony on this point: . .
“Q. When he asked you ' if your brakes were all right and you made those remarks to him, jell me what traffic was ahead of you and what traffic was behind you, if any? A. None at all.
“Q. How fast were you traveling at that time? A. I didn’t look at the • speedometer bút I would say just about 30 or 35 miles an hour.
.“Q. All right. What did you do on that occasion? A. Well, when I pushed the brake the wheels buckled to the left. I saw the truck so' I tried to stop. The car hit the gravel and natural2y skidded right into the truck.
“Q. On that occasion, how many times, if more than once, did you pump your brake or press on your brake? A. Just once; just a normal stop.
“Q. Were you trying to demonstrate to Mr. Christian that you could make an emergency stop? A. I was just going to slow up just enough to show him that my brakes were all right.
' “Q. Did you jam on your brakes? ■ A. No, I just stepped on them.
“Q. You understand what I mean by the word ‘jam’. That has a technical meaning among automobile drivers. That means step on them hard. , Did you step on them hard? A. I wouldn’t say I stepped.on them hard.
“Q. Tell me how did you step on them? A. Just like you would coming up to a corner to stop. You would naturally put your foot on the brakes.”
* * ♦ * * #
“Q. Now, when you applied your brakes — I am not sure that I brought this out. Tell me again how-you applied your brakes when you wanted to stop. Did you jam them on or put them on hard or medium or moderately or make an ordinary stop? A. Just like I was going to make an ordinary stop.”
There is also conflict as to whether or not Walsh gave warning of his intention to stop. He admitted that he “immediately” put his foot on the brakes, but testified that before doing so, he said “watch”. This is denied by Christian, but as we view- the matter, the question of warning is of little importance as it is admitted by counsel for plaintiff that the injuries received by his client were caused by the collision with the truck rather than by the initial application of the brakes.
As pointed out above, there exists a considerable discrepancy in the testimony as to the manner in which the brakes were applied, for, from the above quoted testi-' mony, it will be seen, that the plaintiff contends that Walsh “stomped” or “jammed” on the brakes, whereas the latter insisted that he applied them just as though he con *737 templated only a normal stop. While the trial judge in his brief reasons for judgment did not pass upon this point, it is obvious from his holding that he believed the testimony of the plaintiff rather than the defendant, and a careful examination of the record reveals nothing which would warrant our holding otherwise.
Having concluded that Walsh did “jam” or “stomp” on his brakes we have no difficulty in finding that he was extremely negligent in so doing. The record clearly shows that there was absolutely no reason whatsoever for applying the brakes at all except to demonstrate their condition to Christian in answer to his inquiry. • While there are,, of course, situations which arise which- call for the sudden and forceful application of brakes, there was absolutely no reason whatsoever for the use of such force here and we think it safe to state that the sudden and forceful application of brakes under such circumstances constitutes negligence, which in this case was the proximate cause of the accident.
As pointed out heretofore the defendants raised the defense that 'the accident, was caused by a latent defect in that a small amount of brake fluid had leaked into the. brake band causing it to lock. They did not, however, introduce any direct evidence' tending to show that that is what caused the wheel to lock. True it is1 that testimony was offered showing that if fluid leaked onto the band it would tend to cause a locking of the wheel, we find nothing in the record to show that such was the case here.
Whatever actually caused the wheel to lock is not shown. The record does establish, however, sufficient evidence to indicate that the locking was caused by the sudden and forceful application of the brakes by Walsh, which, as we have said, constitutes the proximate cause of the accident. - Having concluded that the accident' was caused by the negligence of the defendant, Walsh, the only remaining question concerns-that of quantum.
The record discloses that Christian was brought to the Calcasieu Parish Hospital immediately after the accident, where he was tended by Dr. Robert P. Howell, for “minpr lacerations and bruises (and) a comminuted fracture of the left patella”. One of the lacerations left a scar in the center of the forehead which is described as being in a half moon shape and about the size of a fifty cent piece.
The plaintiff remained in the Calcasieu Parish Hospital four or five days and then was taken to his home where he remained in bed for about a week. At the end of this time he returned to the hospital in order that a cast might be put on his leg. After -the cast whs applied, he stayed in bed .another ten days or two weeks, after which he was compelled to use crutches for at least thirty days and then a walking strick for approximately two weeks.
During all this time, plaintiff testified that he suffered severe pain and was forced to take sleeping pills for approximately three weeks in order to get any sleep whatsoever. Dr. Howell corroborated his testimony by stating that from his knowledge of such injuries, he was sure the plaintiff suffered severe pain- for a period of three to four weeks. '
The record shows that the plaintiff is by profession a carpet layer, in the performance of which he is -compelled to perform physical movement which he'described as follows: ' ! : -
“Q. I wish you would" describe' to the court briefly the physical effort and exercise that you would go-'through with in normal laying of carpets or picking it up ? Do you do that standing up? A. No, -you have to be in a kneeling position 95 per cent of the time. It is necessary on the smaller jobs to use what is known in the industry as a carpet kicker which is an instrument with a sponge rubber pad that goes against the knee with an extension bar that connects to a stair-head, which is impregnated with small steel pegs, sharpened on one end. These steel pegs are set at about a 10 degree angle forward and as you come down and put it on the carpet, it digs *738 down through yoúr carpet, just through thé back of it, but it doesn’t catch the padding underneath and you bump it with your knee and move your carpet and stretch it.
“Q. Now, Mr. Christian, when you bump that carpet kicker with your knee, in what position would you be located? A. You are on one knee and you raise up on the other knee and draw back and you slam into it with your other knee. You have to be able to manipulate both knees because when you get against the left wall you have to use your left knee. You can’t kick with your right because you have to kick in a straight line on a number of occasions. However, you kick at' all angles when' laying carpet. On ah average of 100 yards of carpet, you will probably kick the carpet kicker at least 3,000’times during the day while laying carpet.
“Q. When you are bumping that carpet kicker with one knee what is the other knee doing? A. It is just up — well, like a football player fixing to take off and hit the line. He raises up on that knee and throws this knee into it and as that knee hits the kicker, it drops to the floor and anchors the carpet in place. Then you drop the other knee to hold it.
“Q. Prior to the. accident, did you continually use the carpet kicker yourself in the prosecution of your business? A. Yes, no one laid any carpets in Lake Charles but myself for the past eleven years. I made practically every installation in Lake Charles up to that time.
“Q. After the accident occurred, state whether or not you were able to use the carpet kicker in your business? A. I háven’t laid a single piece of car-' pet since I was in the accident. I have had to hire additional help in order to get that done; however, I have been able to''stand by in a supervisory capacity only. That is all. I can get on one knee and bump a piece of carpet occasionally and show the boys how it is done. But to kneel down and lay and stretch and tack carpet, I cannot do that.
“Q. Describe your inability to do that. A. First of all I cannot put any weight on this knee over any period of time. There is a stinging, burning sensation that takes place the minute I start kneeling on that knee. I can’t crawl on that knee at all. If I start .crawling in a forward position, it just locks up on me.
“Q. Have you tried out your knee in the conduct of your business and the handling of this carpet kicker to see if you can do it? Yes, Sir, several times because I am so disgusted with the help I have, I would be only too glad to do it.”
Drs. C. V. and Stakley Hatchette testified that they found a marked increase in an arthritic condition of plaintiff’s left knee and that a trauma, such as the comminuted fracture sustained by plaintiff, can cause such an increase in an arthritic condition. Dr. C. V. Hatchette estimated at the time of trial a disability of the left knee of approximately 25%, while Dr. Howell estimated a 20 to 30% disability. Dr. G. E. Barham,. testified on behalf of defendants, estimated the disability at from 10 to 20%.
It is noteworthy that Dr.. Barham found acute changes in the right knee as being more pronounced than those in the injured knee. Also he found more “roughening” beneath the left patella than beneath the right. It was also this gentleman’s opinion that plaintiff was not prevented from doing his regular work.
The record shows a decrease in the net earnings of plaintiff subsequent to his injury and the fact that he was forced to hire an employee at from- $40 to $45 pet-week. The total medical expenses amount to the sum of $331.50. .
Counsel for plaintiff admitted in oral argument that defendant Walsh had no ability to pay, therefore, taking the above *739 referred to evidence as a whole,, we have come to the conclusion that the award of the trial court is excessive and believe that same should be substantially reduced. Under the circumstances we believe that the amount awarded should be reduced to the sum of $4,500, and as amended, the judgment appealed from is affirmed.
Judgment amended and as amended,-affirmed.